# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Case No. 19-cv-02525-CRB

CLAUDIA RENATI, KRISTIN MARSH, CHERYL NOONE, CAROL MILSE, MICHELLE TYRELL, HOPE GARCIA, DENISE VAN GALDER, KATHLEEN WILKERSON, MAVI ALULQUOY, PAMELA MCCLELEN, SHARON REESE, JENNIFER SEELY, MARY QUINTANILLA, RITA WEISZ, GINA PORTILLO VIERRA, CHERYL STOUT, DARLA HARPER, and SHANNON STEPHENSON

                        Plaintiffs,

v.

WAL-MART STORES, INC., N/K/A WAL-MART, INC.

                        Defendant.

_____/

## <u>AMENDED COMPLAINT</u>

Plaintiffs CLAUDIA RENATI, KRISTIN MARSH, CHERYL NOONE, CAROL MILSE, MICHELLE TYRELL, HOPE GARCIA, DENISE VAN GALDER, KATHLEEN WILKERSON, MAVI ALULQUOY, PAMELA MCCLELEN, SHARON REESE, JENNIFER SEELY, MARY QUINTANILLA, RITA WEISZ, GINA PORTILLO VIERRA, CHERYL STOUT, DARLA HARPER, and SHANNON STEPHENSON [hereinafter referred to as "Plaintiffs"] files this Amended Complaint in compliance with the Court's previous ruling denying Wal-Mart's Motion to Dismiss. (DE 55). Plaintiffs, in their individual and separate capacities bring this action against Wal-Mart Stores, Inc. N/K/A WAL-MART, INC. [Wal-Mart].

Plaintiffs respect that the Court has severed their claims and will await further instructions on whether the Court will direct the clerk to open separate matters or if Plaintiffs should refile individual actions.

## INTRODUCTION

1.    Plaintiffs, and each of them,  bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*., against Wal-Mart for its discriminatory practices against them based on their gender as set forth herein.

## JURISDICTION AND VENUE

2.    Plaintiffs' claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f), 28 U.S.C. §§ 1331 and 1343(a)(4).

3.    Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) & (c).  Each of the named Plaintiffs' claims arose in whole or in part in California and many of the acts complained of occurred in this judicial district and gave rise to the claims alleged.

## BACKGROUND - CASE HISTORY

4.    This action springs from *Dukes v. Wal-Mart*, the national class action filed more than ten years ago.  In *Dukes*, the United States District Court for the Northern District of California certified a national class of female Wal-Mart and Sam's Club employees challenging Wal-Mart's retail store pay and management promotion policies as discriminatory against women.  On June 20, 2011, the United States Supreme Court reversed that class certification order.

5.    Plaintiffs were members of the national class certified in *Dukes*.  While that certification order was working its way through the appellate process, time periods for filing EEOC charges and subsequent litigation for all former class members were tolled.  On August 19, 2011, the Northern District of California issued an order in *Dukes* establishing common deadlines for all members of the formerly certified class to file individual charges with the EEOC.  The pertinent portion of that order in this case gave former class members in states with a work-sharing agreement who would normally have 300 days to file charges, until May 25, 2012 to file a charge.  Plaintiffs have met that deadline.

6.    The relevant time period in this action for the Plaintiffs' claims is based on the limitations period from *Dukes*. The limitations period starts on December 26, 1998, which is 300 days before the earliest charge filed with the EEOC by a former member of the *Dukes* class, and runs through the date of trial.

**Exhaustion of Remedies**

7.    The current  Plaintiffs have exhausted their administrative remedies and complied with the statutory prerequisites of Title VII by timely filing charges of discrimination.

8.    In particular, Plaintiffs have timely filed EEOC charges and Amended EEOC Charges (See Exhibit A, a composite exhibit).

9.    Plaintiffs have also received their Rights to Sue from the Equal Employment Opportunities Commission, which are attached hereto (See Exhibit B, a composite exhibit).

## PARTIES

10. Plaintiff Claudia Renati is a female resident of El Dorado County, California. She was employed by Wal-Mart from 1993 to 2002, and again from January 1994 until June 2000 and worked during that period in Store 6621 in Roseville, California which is in Wal-Mart Region 5. Upon information and belief, Ms. Renati is eligible for rehire.

11. Plaintiff Kristin Marsh is a female resident of San Benito County, California. She was employed by Wal-Mart from 1994 until July 17, 2007, and worked during that period in Store 2002 in Gilroy, California which is in Wal-Mart Region 19 and Store 2458 in Salinas, California, which is also in Wal-Mart Region 19. Upon information and belief, Ms. Marsh is eligible for rehire.

12. Plaintiff Cheryl Noone is a female resident of Lane County, Oregon. She was employed by Wal-Mart from September 1995 to March 2006 and worked during that period in Store 2277 in Clovis, California which is in Wal-Mart Region 16. Upon information and belief, Ms. Noone is eligible for rehire.

13. Plaintiff Carol Milse is a female resident of San Bernardino, County, California. She was employed by Wal-Mart from July 1997 to July 2002 and worked during that period in Store 1905, in Yucca Valley, California which is in Wal-Mart Region 16. Upon information and belief, Ms. Milse is eligible for rehire.

14. Plaintiff Michelle Tyrell is a female resident of Clark County, Nevada. She was employed by Wal-Mart from 1996 to 2003 and worked during that period in Store 1887 in Montoursville, Pennsylvania, and Store 1588 in Victorville, California which is in Wal-Mart Region 16. Upon information and belief, Ms. Tyrell is eligible for rehire.

15. Plaintiff Hope Garcia is a female resident of Santa Clara, County, California. She was employed by Wal-Mart from November 1999 to February 2001 and worked during that period in Store 2524 in San Jose, California, which is in Wal-Mart Region 19. Upon information and belief, Ms. Garcia is eligible for rehire.

16. Plaintiff Denise Van Galder[1] is a female resident of Osceola County, Florida. She was employed by Wal-Mart from October 29, 1998, to August 9, 2008, in Bakersfield, California Store 2557 which is in Wal-Mart Region 16. Upon information and belief, Ms. Van Galder is eligible for rehire.

17. Plaintiff Kathleen Wilkerson[2] is a female resident of Lake County, California. She was employed by Wal-Mart from April 12, 2000, to September 9, 2009 and worked during that period in Store 1979 in Clearlake, California which is in Wal-Mart Region 19. Upon information and belief, Ms. Wilkerson is eligible for rehire.

18. Plaintiff Mavi Alulquoy is a female resident of Santa Barbara County, California. She was employed by Wal-Mart from January 1, 1999, to February 1, 2002, and worked during that period in Store 2507 in Santa Maria, California which is in Wal-Mart Region 16. Upon information and belief, Ms. Alulquoy is eligible for rehire.

19. Plaintiff Pamela McClelen is a female resident of Kern County, California. She was employed by Wal-Mart from 1991 to 2001 and worked during that period in Stores 1574 and 1600 which are in Wal-Mart Region 19. Upon information and belief, Ms. McClelen is eligible for rehire.

---

[1] Employed at Wal-Mart under the name Sephus
[2] Employed at Wal-Mart under the name Salvato

20.     Plaintiff Sharon Reese is a female resident of Los Angeles, County, California. She was employed by Wal-Mart from January 14, 2003, to November 2006 and worked during that period in Store 2960 in Baldwin Park, Los Angeles, California, which is in Wal-Mart Region 16, and Store 5072 in South Bay, Torrance, California, which is in Region 16.  Upon information and belief, Ms. Reese is eligible for rehire.

21.     Plaintiff Jennifer Seely is a female resident of Hawaii County, Hawaii. She was employed by Wal-Mart from January 18, 2007, until December 21, 2009, and worked during that period in Store 2553 in Windsor, California, which is in Wal-Mart Region 19.  Upon information and belief, Ms. Seely is eligible for rehire.

22.     Plaintiff Mary Quintanilla is a female resident of Yuba County, California. She was employed by Wal-Mart from October 13, 2006, until approximately 2015 and worked during that period in Store 1903 in Yuba City, California which is in Wal-Mart Region 19.  Upon information and belief, Ms. Quintanilla is eligible for rehire.

23.     Plaintiff Rita Weisz is a female resident of Ventura County, California. She was employed by Wal-Mart from March 1999 until October 2000, and worked during that period in Store 2621 in Simi Valley, California, which is in Wal-Mart Region 19.  Upon information and belief, Ms. Weisz is eligible for rehire.

24.     Plaintiff Gina Portillo Vierra is a female resident of Sacramento County, California and was employed with Wal-Mart from 2003 to 2005 in Store 1760 in Folsom, California, which is in Region 19. Upon information and belief, Ms. Vierra is eligible for rehire.

25.     Plaintiff Cheryl Stout is a female resident of Lancaster County, California and was employed with Wal-Mart from October 2000 to May 2007 in Store 1660 in Palmdale,

California, which is in Region 19. Upon information and belief, Ms. Stout is eligible for rehire.

26. Plaintiff Darla Harper is a female resident of Lancaster County, California and was employed with Wal-Mart from October 1995 to December 2005 in Washington State until 1997 and then Store 1615 in Palmdale, California, which is in Region 19. Upon information and belief, Ms. Harper is eligible for rehire.

27. Plaintiff Shannon Stephenson is a female resident of San Bernardino County, California and was employed with Wal-Mart from 1995 to 2005 in the Rialto, California Store 1862,  the Glendora, California, store 1941, the Fresno, California store 1815, and the Apple Valley, California Store number 2333, which are in Region 19. Upon information and belief, Ms. Stephenson is eligible for rehire.

28. Defendant Wal-Mart Stores, Inc., is a Delaware corporation with stores throughout California.  Its corporate headquarters is located in Bentonville, Arkansas.  In California, Wal-Mart operates retail stores doing business as Wal-Mart Discount Stores, Wal-Mart Supercenters, and Sam's Clubs.

29. Wal-Mart currently operates over 212 Wal-Mart stores and Sam's Clubs in California.

30. Wal-Mart's operations are divided into regions.

31. During the time relevant to the Plaintiffs herein, there were a total of 41 regions: 35 Wal-Mart regions and six Sam's Club regions.

32. The three regions at issue in this case, all falling within the Western United States, consist of:

    a. Wal-Mart Region 19—approximately 108 Wal-Mart retail stores, located in Washington, California, and Oregon and

b.  Wal-Mart Region 16—approximately 104 Wal-Mart retail stores, located in mostly located in California, Hawaii, and Arizona.

c.  Sam's Club Region 5—one of only 6 Sam's Club regions in the United States, consisting of approximately 104 Sam's Club retail stores, mostly located in Kansas, California, Alaska, Iowa, Montana, Wisconsin, Minnesota, Nebraska, Missouri, and Illinois;

33.  Plaintiffs Cheryl Noone, Carol Milse, Michelle Tyrell, Denise Van Galder, Mavi Alulquoy,  Pamela McClelen, Rita Weisz, Sharon Reese, Gina Portillo Vierra, Cheryl Stout, and Shannon Stephenson worked for Wal-Mart at the Wal-Mart Region in Region 16.

34.  Plaintiffs Claudia Renati worked for Wal-Mart at the Sam's Club Region 5.

35.  Plaintiffs Kristin Marsh, Hope Garcia, Kathleen Wilkerson, Darla Harper, Jennifer Seely, and Mary Quintanilla worked for Wal-Mart in Region 19.

36.  Plaintiffs contend that in Wal-Mart Region 19, 16 and Sam's Club Region 5, Wal-Mart maintained a pattern or practice of gender discrimination in compensation and promotion. While Plaintiffs bring their claims individually, the evidence that Wal-Mart engaged in a pattern of discrimination in compensation and promotion is relevant evidence that may be used by each individual plaintiff to support her assertion that Wal-Mart's actions with respect to her own pay and promotion were driven by gender discrimination. And, in each of the above Regions, the compensation and promotion policies and practices of Wal-Mart had a disparate impact, not justified by business necessity, on female employees including the Plaintiffs.

**FACTUAL ALLEGATIONS**

**Organizational and Store Structures: Common Threads**

37.   *Store Formats*—Within Wal-Mart Region 19 and 16, Wal-Mart has operated in these primary formats—Wal-Mart Discount Stores and Wal-Mart Supercenters. Within Sam's Club Region 5, Wal-Mart has operated in only one format—Sam's Clubs. The basic organizational structure for the retail stores within each Region has been the same throughout the Region.

38.   *Common Hourly Jobs Within Stores*—The stores within each Region use common job titles and job descriptions, and the same job hierarchies, throughout the Region.

39.   *Most Common Positions*—While there are numerous job titles at Wal-Mart, the majority of hourly employees have worked as sales workers, cashiers, department managers and stockers. The most common management position is assistant manager.

40.   *Common Department Structure*—Stores within each Region have been divided into numerous departments, which are staffed by hourly paid employees. Some departments have been designated as specialty departments. In each Region, the departmental structure in the stores is the same throughout the Region.

41.   *Common Management Jobs*—With the exception of Support Manager, management positions within each Region are salaried. Within each Region, each store has Assistant Managers, while larger stores have had one or more Co-Managers who supervise Assistant Managers and other staff. All stores have Store Managers who are in charge of the store. Specialty department managers, who report to Store Managers, also report to District and Regional Specialty Managers above the store level.

42.   *District Organization*—Stores within each Region are grouped into districts consisting of at least six stores that are supervised by District Managers.

43.  *District Manager's Role*—Within each Region, District Managers are responsible for ensuring store compliance with company policies and culture. District Managers are based in their districts and spend their time visiting and monitoring the stores in their districts and reviewing all facets of the store operations. District Managers also have authority to make or approve compensation and promotion decisions for hourly employees in the stores within their district.

44.  *Regional Organization*—Each Region consists of multiple districts that are headed by a Regional Vice President. Wal-Mart Region 19 consists of approximately 13 districts, and 16 consists of approximately 14 districts; and Sam's Club Region 5 consists of approximately 10 districts.

45.  *Role of Regional Vice President*—The Regional Vice President of each Region monitors and implements corporate and regional policies regarding compensation and promotion, and makes decisions regarding the pay and promotion of employees working within the Region.  The women here in Regions 16, 19, and 5 were subject to policies for pay and promotion monitored and implemented by a single Regional Vice President for each of their regions.

46.  Upon information and belief, certain policies regarding pay and promotion implemented by the Regional Vice President of each region were established at a corporate level, in Bentonville, AR, and applied consistently within each Region, thus subjecting each of the women in the three Regions to similar policies and procedures, at issue herein, regardless as to regional situation.

47.  In each Region, the Regional Vice President regularly meets with District Managers and receives weekly reports from District Managers about the activities in the Region

stores they supervise. Each Regional Vice President is charged with the ultimate responsibility to ensure that personnel decisions in his Region are made in a consistent and lawful manner and has the authority to direct changes to personnel decisions.

48.     *Regional Personnel Manager's Role*—Each Region has a Regional Personnel Manager, who assists the Regional Vice President and District Managers in making pay and promotion decisions for employees working within the Region's stores.

49.     *Divisional Organization*—Each Regional Vice President reports to a Divisional Senior Vice President, and upon information and belief, that position is located at corporate, in Bentonville, Arkansas.

50.     *Management Team*—Each Region has a "Management Team" consisting of the District Managers, Regional Vice President, and Regional Personnel Manager that provides direction, oversight, and approval of pay and promotion practices at the stores within the Region.

51.     Upon information and belief, the Regional Vice Presidents of Regions 16, 19 reported to the same Divisional Senior Vice President, who had oversight and approval on certain decisions of pay and promotion, at issue herein. Upon information and belief, the Regional Vice Presidents of Region 5 reported to a Divisional Senior Vice President, who had oversight and approval on certain decisions of pay and promotion, at issue herein. Upon information and belief, all Divisional Senior Vice Presidents were based out of Bentonville, Arkansas and implemented corporate policies from Bentonville, Arkansas

**Compensation Discrimination Within the Regions**

52.    *Common Compensation Policies*—Within each Region, compensation of store-based

employees has been set based upon a common set of guidelines from the Management

Team that are applied consistently throughout the Region and establish basic standards

for setting pay rates at hire and subsequent pay adjustments of hourly and salaried

employees, hereby referred to as Pay Guidelines.

53.    *Hourly Job Classes*—Within each Region, all hourly positions have been grouped into

various job classes, later called "pay groups," which are uniform throughout the

Region. All employees with the same job title were placed in the same job category

until 2004, when pay group varied by department as well as job title.

54.    *Job Class Pay Rates*—Within each Region, the minimum pay levels at hire ("start

rates") for each job class have been established for each store with the approval of the

Management Team. Thereafter, an employee's pay level may be adjusted: 1) after an

initial probationary period; 2) if the employee is promoted to a higher job class or into

management; 3) on an annual basis if the employee satisfies minimum performance

standards; or 4) if the employee has been awarded a special "merit" raise.  Many

applicants are interested in multiple positions, to maximize their chance of being hired.

The Store Manager's decision as to what position to offer an applicant at hire

establishes the minimum pay level that may be offered.

55.    *Process for Setting Hourly Pay*—Within each Region, the Store Manager of each retail

store has the initial responsibility to set pay rates for that store's individual hourly

employees within the pay guidelines, subject to a number of constraints set by the

Management Team.  When a Store Manager sets a pay rate above or below the

guidelines, the rate is called an "exception" and is subject to the approval of the Management Team.

56.     *Hourly Pay Exceptions*—The pay rate for a new employee may be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate is more than 6% above the established start rate for that pay class, then, as late as 2002, the District Manager was required to approve the rate. In virtually every store in each Region, a significant proportion of employees have been paid 6% or more above the start rate.

57.     *Approval of Exceptions*—In each Region, hourly pay exceptions are automatically reported to the District Manager who must then approve or disapprove each exception. The Management Team is also informed of hourly pay exceptions and is required by Wal-Mart policy to ensure that hourly compensation is consistent among employees throughout the Region.

58.     *Hourly Pay Reports and Audits*—Within each Region, the District Managers, Regional Personnel Managers, and Regional Vice President regularly receive reports of all employees whose hourly pay in a job category is more than 10% below or 5% above the average pay in that class. The District Managers also perform quarterly audits of each store's compliance with company policies, including compensation policies, which are reported to Regional Personnel Managers and Regional Vice Presidents. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

59.     The Management Team for each Region has the ultimate authority whether, and by how much, to adjust the pay of all hourly employees, including those who are listed on exception reports, and exerts ultimate control over the pay and promotion decisions in

the particular stores of each Region. The Management Team of each Region has subjected the Plaintiffs employed in the stores of that Region to a common mode of exercising discretion, which was overseen by a Senior Vice President for Regions 16 and 19 and another Senior Vice President for Region 5, all in Corporate Bentonville, Arkansas.

60.   *Adverse Impact of Post-2004 Pay Restructuring* — From 1998 through June 2004, Wal-Mart assigned jobs to five job classes, the top two of which were only used for a few specialty jobs.  Jobs were assigned to the same class regardless of department. Each successive job class had a higher minimum starting pay rate.  In 2004, Wal-Mart introduced a new pay structure, in which many jobs which had previously been in the same pay class were assigned to separate classes, and job titles which had previously been considered one job regardless of department, were assigned to different pay classes depending on department.  Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.   The proportion of women in Wal-Mart's departments varied greatly.  Many jobs in departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes.  Wal-Mart's 2004 pay restructuring had an adverse impact on female employees, including Plaintiffs, and was not justified by business necessity.

61.   Starting in 2005, Wal-Mart changed how starting pay was established for hourly employees.  A corporate policy determined how many credits could be awarded based upon past experience, but only within the five (5) years prior to hire.  Credits were

worth different amounts, and available to a different degree for jobs in different job classes. Thus, the assignment of jobs to job classes, which had a disparate impact on women compared to the prior system of job classes, and the store manager decision about which job to assign an individual to, combined to determine starting pay, pursuant to a formula that had an adverse impact on women, including Plaintiffs.

62. In 2006, Wal-Mart added a cap on the pay permitted for each job class, further impacting the pay of women relegated to the lower job classes, which had lower pay caps. This also had an adverse impact on female employees, including Plaintiffs.

63. *Salaried Pay Guidelines*—Within each Region, salaried employee compensation is required to be made in accordance with pay guidelines for each salaried position.

64. *MIT Pay* — Participants in the MIT program initially were assigned a single start rate of $27,500 per year, although exceptions could be requested. But, starting in 2002, hourly employees promoted to MIT had their pay set based on their pay as an hourly employee. For external hires, however, there was substantially more leeway until 2008. In general, external hires had their pay set based on how their experience compared to individuals already working as Assistant Managers.

65. The RPM was responsible for setting pay for MITs. While the pay rates for MIT participants who had been hourly Wal-Mart employees was largely governed by formula, the RPM generally was responsible for approving any exceptions and for setting starting pay rates for external hires for whom no formula controlled.

66. These policies contributed to the observed pay disparities in three ways. First, for those promoted from hourly positions, women on average had lower hourly pay rates and, therefore, their pay rates in the MIT program were lower than similarly-situated

men.  Thus, the "start low, stay low" phenomenon was not just a feature of hourly pay, but one that continued to influence MIT and Assistant Manager pay rates.  Second, the higher pay offered to external candidates as compared to internally-promoted MITs provided another opportunity to pay men more than women in the MIT program.  Third, any discretion permitted in setting managerial pay rates, both for internal and external candidates, was exercised by a single decisionmaker, the RPM.

67.    *Assistant Manager Salary*—In each Region, Assistant Manager pay is derived by a formula set forth in the policy, with exceptions determined by Regional Personnel Managers.

68.    The pay for Assistant Managers was also linked to their rate of pay while in the MIT program, but as described above, their MIT pay provided for higher compensation than for internal candidates.  Any exceptions to these formulaic rules required approval of the RPM, with input by the Senior Vice President, if necessary.

69.    This formulaic use of prior pay rates to set starting Assistant Manager pay meant prior pay disparities adverse to women would be perpetuated.  And the use of exceptions, all ruled on by a single individual RPM (with input by the Senior Vice President, if necessary) provided the opportunity to create additional disparities adverse to women.

70.    Assistant Managers also received performance evaluations and associated performance pay increases each year, all on the same date.  These were prepared by the Store Manager and District Manager, which were then reviewed and approved by the RVP (with input by the Senior Vice President).  These performance increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay.  Performance

ratings, all approved by the RVP, could incorporate bias and unfairly rate women Assistant Managers lower than their peers.

71.    In addition to performance increases, Assistant Managers could receive merit increases from 2002 to 2006, which had to be approved by the District Manager and RPM.  These merit increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay.  And they provided an opportunity for these decisionmakers to exercise bias in choosing whom to favor with these discretionary pay increases.

72.    *Co-Manager Compensation*—In each Region, Co-Manager compensation is comprised of a base salary and profit sharing tied to the profitability of the Co-Manager's store. Regional Vice Presidents determine base salary and assign the stores at which Co-Managers work, the profitability of which affects the profit-sharing component of the compensation they receive. Women, including Plaintiffs, have been assigned to stores that generate lower profits, and as a result were paid less than their male counterparts.

73.    *Pay Decisions Not Job Related Or Documented*—In each Region, Managers are not required to use job related criteria such as job performance or experience in setting, adjusting, or approving compensation for individual employees. The managers within a Region do not document the reason for setting, adjusting or approving the compensation of individual employees. The Management Team of each Region does not hold the managers in the Region accountable for the factors they use in making pay decisions or in ensuring those factors comport with the law, nor do they require any documentation of the reasons for the compensation paid to individual employees. Nor do the managers within a Region specify the weight that should be accorded any requirement for setting or adjusting compensation.

74.     *Patterns in Compensation*—In each Region, women who hold salaried and hourly positions have been regularly paid less on average than similarly-situated men, although on average the women have more seniority and higher performance ratings than the men. This gender pay difference adverse to women exists in the vast majority of the stores of each Region, even when nondiscriminatory objective factors, such as seniority, performance, store location and other factors are taken into account. A statistical analysis of this gender discrimination revealed the impact of these policies and practices within each Region:

a.  Female employees were consistently paid less than male employees in the same position even though women had higher average performance evaluation scores, more seniority and lower turnover rates. Among hourly workers, women in the California Regions earned about $878 - $1298 less than did men in 2001.

b.  For management employees, the gender pay gap was $11,102–$13,700.

c.  The differences in pay for men and women could not be explained by seniority. Women had longer average tenure (3.59 and 3.33 years for Regions 16, 19 respectively) than do men (2.63, 2.34, 3.54 years).

d.  For employees hired into hourly positions in 1996, the average pay for men was $0.21 to $0.29 per hour more than for women in the Region. For those 1996 hires who remained through 2002, the gap in pay for men and women increased to $0.46 to $1.78 per hour on average. For a Cashier in Region 16, this would mean a woman earning $17,115 instead of $18,480 like her male peer— a significant difference.

e.  Women made 1-2% less per hour than men (depending on region and year) and the disparities were statistically significant (t-values ranged from -6.58 to -11.43 for Wal-Mart regions and -1.41 to -5.19 for Sam's).

f.  The disparity increased because women had higher average performance ratings scores than did men. Over 80% of the store-level results were adverse to women in the Wal-Mart Regions, and over 63% in Sam's.

g.  Women were paid 3.1 to 14.1% less than similarly situated men in every year and resulted in a t-values of -1.36 to -5.12.

h.  When compared to a male Assistant Manager earning $31,000/year in Region 19, a female Assistant Manager would take home only $28,179 in 2001.

i.  Female employees in the California regions for Wal-Mart and Sam's Club were paid less than men in every year, even when relevant non-discriminatory factors were considered.

75.  *Management Knowledge of Compensation Discrimination*—In each Region, the Management Team receives regular reports about compensation for hourly and salaried employees within the Region showing that female employees were paid less than men on average. Here, the Plaintiffs were affected by that discriminatory pay system.

76.  *Adverse Impact of Compensation System*–Wal-Mart's compensation policies, including its failure to require managers to base pay decisions for individual employees on job related criteria such as experience or documented performance, its policy of setting pay adjustments based on the associate's prior pay, and its 2004 pay class restructuring, have had an adverse impact upon its female employees in each Region including the Plaintiffs. These policies have resulted in a disparate impact on women including the Plaintiffs. The disparate impact is not justified by business necessity.

**Promotion Discrimination Within The Regions**

77.  *Hourly Positions*—Subsequent to 2004, hourly positions were divided into an increased number of separate job classes or pay groups, each with its own pay range. At that time, movement from an hourly position in a lower pay group to an hourly position in a higher pay group became one of the significant avenues to increase compensation.

78. *Management Track Positions Below Assistant Manager Positions*— Within Wal-Mart Region 19, Support Managers are the highest level hourly supervisory positions and assume the duties of Assistant Managers in their absence. Within Sam's Club Region 16, Area Managers are the highest level hourly supervisory positions and assume the duties of Assistant Managers in their absence. Employees in the position of Support Manager or Area Manager are often groomed for further advancement. In Wal-Mart Regions 19 and 16, the vast majority of vacancies for the position of Support Manager were not posted prior to 2003, and there was no formal application process for selection for this position or any job related criteria for making selections of those to be promoted to the position of Support Manager prior to 2005.  In Sam's Club Regions 5, the vast majority of vacancies for the position of Area Manager were not posted prior to at least 2003, and there was no formal application process for selection for this position or any job related criteria for making selections of those to be promoted to the position of Area Manager prior to 2005.

79. *Promotion to Management Trainee*—Within each Region, including those Regions at issue in this action, entry into the Management Trainee Program is a requirement for advancement into Assistant Manager and other salaried management positions. Prior to 2003, there was no application process or job posting for Management Trainee positions. Throughout each Region, hourly employees were not provided any information regarding how to enter management, what the requirements or qualifications were for entering management, or how to apply for the Management Trainee Program.

80.   *Criteria for Promotion to Management Trainee*—Within each Region, District Managers, assisted by Regional Personnel Managers, select management trainees based upon uniform guidelines setting minimal eligibility criteria for promotion into the Management Trainee Program, including: minimum tenure; age (18 years or older); absence of current "active" discipline; satisfactory recent performance evaluation; and willingness to relocate. They are not, however, provided with any job related criteria for making selections among those who meet the minimum criteria. Within each Region, subject to very limited exceptions that must be approved by the Regional Personnel Manager and Regional Vice President, an employee selected into the Management Training program is required to transfer from his or her store, and often his or her district, upon entering training and upon assuming an Assistant Manager position.

81.   *Promotion to Co-Manager*—Within each Region, Regional Vice Presidents select Co-Managers subject to approval by the Divisional Senior Vice President. The majority of Co-Manager promotions are transfers across district lines. Co-Manager openings have rarely been posted and there has been no formal application process for such positions. While there have been minimal eligibility requirements for promotion to Co-Manager, such as satisfactory performance and willingness to relocate, there are no job related criteria for making selections among those who meet the minimum criteria or for determining which store to assign to a Co-Manager.

82.   Within each Region, the promotional policies and practices regarding management-track positions have denied interested and qualified females equal access to promotional opportunities because promotion opportunities are not posted, there is not

an open application system, and employees are not informed of the criteria for promotion. Moreover, within each Region, managers fail to require or use valid, job-related factors in making the promotion selections within the Region. Nor does Wal-Mart specify the weight that should be accorded any requirements for promotion, provide for detailed objective criteria for the selection of employees for promotion, or monitor the policies and practices used in each Region for the selection of employees for promotion. As a consequence, qualified women, including the Plaintiffs herein, in each Region have been denied equal access to promotions because of their gender.

83.  *Management Trainee Registration of Interest*—In January 2003, Wal-Mart instituted within each Region an online application process for entry into the Management Training Program. In order to be considered as an applicant, employees were required to agree to a set of conditions, many of which had the purpose and effect of discouraging women from seeking management positions. Potential applicants for entry level store management positions were required to accept the conditions that, as Assistant Managers, they would: travel for up to six weeks in duration; be subject to a varied and irregular schedule, including working on scheduled days off and working during days, overnights, weekends, and holidays; have scheduled days off that were not consecutive and were rotated weekly; and have scheduled hours that could be changed or increased without notice. None of these requirements is justified by business necessity in any of the Regions, and it is untrue that Assistant Managers in any of the Regions must normally travel up to six weeks. But failure of an employee to accept all of these conditions precluded that employee's consideration as an applicant

for a management position, which has resulted in the exclusion of interested and qualified women in each Region from the management training program.

84. *No Documentation of Promotion Decisions*—The managers in each Region have failed to document, and Wal-Mart has not tracked, the reason for selecting a particular employee for a management promotion. The managers in each region have failed to document, and Wal-Mart has not tracked, which employees have been denied consideration for promotion because of their inability to comply with the relocation, travel, or scheduling requirements for promotion.

85. *External Statistics*—In each Region, Wal-Mart has had a significantly lower percentage of female managers than its largest competitors.

86. *Internal Statistics on Promotion Rates*—Female employees in each Region, and in each district within each Region, have been much less likely than their male counterparts to receive promotion to management track positions, including Support Manager (Wal-Mart Regions), Area Manager (Sam's Club Region), Management Trainee, Assistant Manager, and Co-Manager, despite the fact that they possess equal or better qualifications than their male counterparts.

87. *Internal Statistics on Time to Promotion*— Female employees in each Region, and in each district within each Region, must wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications.

88. *Management Knowledge of Promotion Discrimination*—Wal-Mart management has long known about gender disparities in promotion in each of the Regions and has failed to take any remedial action.

89.   *Reporting by Gender*—Every store and district within each Region regularly compiles and reports to corporate headquarters the gender composition of its hourly and managerial workforce, employee turnover, exceptions to promotion policies, job posting data, entry into management training programs, and other data. The District Managers, Regional Personnel Managers, and Regional Vice President for each Region receive these reports.

90.   *People Division Reports*—Wal-Mart's People Division regularly prepares reports for senior management summarizing promotion and incumbency rates for store management positions by gender, and reports are regularly made to the Board of Directors.

91.   *Store Visits*—Within each Region, District Managers, Regional Personnel Managers, and the Regional Vice President regularly visit stores and are aware of the gender composition of the workforce.

92.   *Warnings About Discrimination*—Senior management officials, senior People Division officials, and/or outside consultants have warned Wal-Mart that women in each Region are not sufficiently represented in management positions, that women in each Region are paid less than male employees in the same jobs, and that Wal-Mart lags behind its competitors in the promotion of women to management positions in each Region.

93.   *Discriminatory Practices Identified*—These officials and/or consultants have also identified policies and practices at Wal-Mart that have an adverse impact on its female employees in each Region, including lack of consistent job posting; the requirement of relocation as a condition of entry into and promotion through management; reliance on

stereotypes in making pay and promotion decisions; lack of objective criteria for making promotion decisions; and lack of consistent and reliable scheduling for management level employees.

94.     *Relocation Unnecessary*—Wal-Mart's founder, Sam Walton, conceded in 1992 that Wal-Mart's policies, particularly its relocation requirement, were an unnecessary barrier to female advancement, yet this policy remained in place thereafter.

95.     *Changes Blocked*—Senior managers also blocked policy changes, such as the posting of managerial vacancies, that would have reduced the impact of Wal-Mart's discriminatory policies within each Region.

96.     *Failure to Analyze*—Wal-Mart had never studied nor analyzed whether any of its practices were consistent with business necessity or whether less discriminatory alternatives to these policies and practices could be adopted in each Region.

97.     *Adverse Impact of Promotion Policies*—Wal-Mart's promotion policies, including its failure to require managers to base promotion decisions for individual employees on job related criteria, have had a statistically significant adverse impact upon its female employees in each of the Regions, including the Plaintiffs. Because reasons for promotion decisions are not documented, and Wal-Mart does not create or maintain records that identify the impact of separate components of its promotion policies and practices, its promotion decision-making process is not capable of separation for analysis.

**Wal-Mart Managers Create Corporate Culture of Bias Based on Gender Stereotypes**

98. In the absence of job-related compensation and promotion criteria, Wal-Mart's managers rely on discriminatory stereotypes and biased views about women in making pay and promotion decisions within each Region.

99. A 1998 survey of Wal-Mart managers revealed that there was a "good ole boy philosophy" at Wal-Mart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."

100. A committee of Wal-Mart's few female executives, disbanded before this action was filed, noted that "stereotypes limit the opportunities offered to women."

101. Within each Region, all Wal-Mart Store Managers have been required to attend training programs at the company's Walton Institute. These managers were advised at the Institute that the reason there are few senior female managers at Wal-Mart is because men were "more aggressive in achieving those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less qualified women over more qualified men.

102. On or about January 24, 2004, at a meeting of all Wal-Mart's District Managers presided over by Wal-Mart Stores' CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "[y]ou are the culture." The key to success was described as "single focus to get the job done. . . . women tend to be better at information processing. Men are better at focus single objective." The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders."

103.   This corporate culture of discrimination based upon gender stereotypes is manifest in each Region:

a.   Between 1999 and 2010, at Store 2524 in Region 19, a female employee applied to 20-30 store manager positions in New Mexico, Nevada, and California, had worked for Wal-Mart for over 20 years, but watched as males who had less experience were promoted over her.

b.   Between 1999 and the present, at Store 2537 in Region 19, a female employee registered her interest in the company intraweb to show her preference for support manager positions, but would notice that her preferences were modified to remove the registration of interest. Instead, the positions were given to less qualified males.

c.   Between 1998 and 2010 in Store 1853 in Region 16, a female employee who was passed over for a co-manager position by a less experienced male overheard her upper level managers comment that "women were too weak to do the job" and they are "just bitches."

d.   Between 1999 and 2003 in Store 2735 in Region 19, a female employee only learned of promotional opportunities becoming available when a new male was promoted into the position – they were never posted. She overheard a department manager tell a coworker during a company picnic that certain management positions were being held for men.

e.   Between 1995 to 2005 in Store 2333 in Region 16, a female employee was promised a promotion to Assistant Manager if she performed certain duties. She followed directions perfectly, but continued to get passed over for promotions. Instead, she watched as males she trained under her got promoted, despite the males having less experience.

f.   Between 1998 and 2001 in Store 2208 in Ponoma, California, a female employee learned that one of the men hired into the same position and same hours as her was making $1,200 per paycheck, while she was only making $700.00 per paycheck.

104.   Evidence of pay disparities based upon gender discrimination is also manifest in the applicable regions:

a.   Between 2003-2006, in Store 2621, in Region 16, a female employee learned that her male coworkers who were promoted to Department Manager were automatically given a raise, but she was promoted to Department Manager, she was not provided a raise

b.   Between 1998 and 2001, at Store 1789, in Region 19, a female employee with eight (8) years of employment with Wal-Mart, learned she was being paid less than new male associates hired to work in her department, even though the male had no prior experience in retail and had never worked at Walmart. The female employee complained to her store Manager Eric Papacosta who said he would "look into it" but nothing was done.

c.   Between 2004 and 2007 in Store 1862 in Region 16, a female employee was making $7.40 per hour and learned that less experienced male cashiers were making $9.00/hour.

d.   Between 2006 and 2007 in Store 2100, a female employee was offered pay around minimum wage of $6.75 hour, but learned a male hired at the same time as her was making $10.00, even though he had less than five (5) years of customer service as she had.

e.   Between 2002 and 2006 at Store 2526 in Region 16, a female employee learned that two male assistant managers were making $2,000 to $5,000 more than her. In fact, one of her male Assistant Manager coworkers made $58,000 per year while she made $42,0000, despite equal qualifications. She complained to Human Resources Manager Travis Thorton and he said she could not receive a raise.

f.   Between 2005 and 2008 in Store 1624 in Region 16, a female employee learned that her male team lead coworkers were earning $2.00 to $2.00 more than her at the time, despite equal or less qualifications.

g.   Between 1999 and 2012 at Store 1917 in Region 16, a female employee worked for ten (10) years without a single raise, but learned her male coworkers were being paid more, even though she had been working at Wal-Mart twenty (20)

years longer. When she complained, she was told she was "locked into her salary" and could not make any more.

## Wal-Mart's Ineffective Anti-Discrimination Efforts

105.   Prior to the filing of the Dukes class action, Wal-Mart had no meaningful policies or practices to hold managers accountable, financially or otherwise, to equal employment and diversity policies and goals.

106.   Starting in 2000, Wal-Mart asked District Managers to set diversity "goals" for advancement of women in management. The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications. Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers.

107.   As late as 2003, Wal-Mart Stores' CEO Coughlin was not aware of any diversity goals or whether managers had met such goals. Many Store Managers were also unaware of the existence of any diversity goals.

108.   Until at least 2003, there had never been any diversity goals set for individual stores, or for any compensation practices.

## Wal-Mart's General Policy of Gender Discrimination

109.   At all relevant times herein, and to the best knowledge of Plaintiffs, Wal-Mart engaged in a general policy of gender discrimination in each Region, evidenced by its de facto practice of denying women equal pay for hourly retail store positions, denying women equal pay for salaried management positions up to and including Co-Manager, and denying women equal opportunities for promotion to management track positions up to and including Store Manager. In each Region, including Regions 5, 19 and 16, Wal-Mart accomplished this discrimination by:

a.   engaging in a pattern or practice of making pay and promotion decision on the basis of gender and specifically paying each Plaintiff less than her similarly situated male peers, and denying Plaintiffs promotional opportunities.

   i.   Specifically, each Plaintiff herein has either been denied equal pay for salaried positions or hourly positions.

   ii.   Additionally, each Plaintiff herein has been denied promotional opportunities for the following positions:

      1.   Support Manager/Zone Manager/Position Equivalent

      2.   Management in Training/Assistant Manager/Position Equivalent

      3.   Co-Manager/Position Equivalent

      4.   Store Manager/Position Equivalent

b.   failing to change pay and promotion policies and practices with an adverse impact on its female employees even though those policies and practices were not justified by business necessity and there were less discriminatory alternatives available;

c.   failing to establish and institute effective practices and procedures to ensure that its workplace would be free of invidious and illegal gender discrimination;

d.   acting with reckless indifference to the rights of Plaintiffs despite systemic gender discrimination in the equal pay and promotion of its female employees; and

e.   failing to take adequate steps to correct known discriminatory disparities.

## ALLEGATIONS OF PLAINTIFFS

**Region 5**

**Plaintiff Claudia Renati**

110.   Plaintiff Claudia Renati began her employment with Sam's Club in March 1993 and remained employment until June 2002. She returned to the Roseville, California Store Number 6621, in January 1994 as a Marketing Team Leader, an associate position, and remained at the store until her separation in June 2000.

111.   Prior to joining Wal-Mart, Ms. Renati held a career in real estate as an agent with a real estate license and attended three (3) years of college-level courses at Cal State Hayward.

112.   By 1992, the real estate market took a downward turn and Ms. Renati needed a paycheck to support her family. She applied to work at Pace in Roseville California Store Number 6621 and was hired at $6.25 per hour into the position of cashier and working her way up to Membership Desk Marketing Team Leader making approximately $10.00 per hour. Eventually, Pace became Sam's Club and her employment was transferred.

113.   Early on in her employment, Ms. Renati completed all the tasks of a Regional Sales Manager for two (2) years, but without the proper title or pay.

114.   Throughout the time she worked at Sam's Club, she expressed interest in promoting into management.

115.   However, there was no actual application for the management training program, so Ms. Renati waited to be asked by an upper level manager to get in and continued to discuss her aspirations for management with her managers.

116.   Ms. Renati asked Director of Operations Bob Alderman to promote her to the Regional

Sales Manager position, but he refused because Ms. Renati had not gone through the

MIT program.

117.   When Ms. Renati asked about getting into the program, Mr. Alderman told her that she

would have to be willing to sell her house and move to Alaska. However, Ms. Renati

observed multiple males with less experience get promoted into the program, including

those with less tenure at Wal-Mart to her. Instead, she explained she could not relocate

to Alaska, but she would be willing to transfer to any Sam's Club store within the region

to get into the MIT program and obtain a promotion.

118.   Shortly thereafter, Mr. Alderman hired his neighbor, Michael Hasley to be the

Marketing Manager. Mr. Hasley had no managerial experience and had not gone

through the management training program. Mr. Hasley was hired to be Ms. Renati's

supervisor, yet she was responsible for training him.

119.   By 1995, Ms. Renati had trained 10 associates in her area and was responsible for

supervising 24 employees. She consistently spoke with General Manager Lovina

Kirkpatrick about moving into other positions such as the claims department in order

to improve my opportunities for promotions. Ms. Kirkpatrick was unresponsive.

120.   That same year, Mr. Hasley (Alderman's neighbor) left the Marketing Manager

position. Ms. Renati again asked Mr. Alderman about moving into this position or into

management training, but Mr. Alderman told Ms. Renati that the position had been

filled. He had hired another neighbor, a male, Kirby Jessen who was trained as a

Microbiologist. He also had no management experience and had not gone through the

management training program. Once again, Ms. Renati had to train a man who was

hired to be her supervisor. Mr. Jessen quit one year later because he was unable to handle the responsibilities.

121.    Ms. Renati continued to inquire to Ms. Kirkpatrick and the new Director of Operations Phil Goodwin about opportunities to attend training classes in order to assist in her chances of getting promoted. Mr. Goodwin and Ms. Kirkpatrick told her that training classes were only available for managers. Ms. Renati returned to school in 1999 to get her business degree in order to improve her chances of a managerial position.

122.    Throughout her career with Sam's Club, Ms. Renati always received "Above Standard" or "Exceptional" ratings on her evaluations and she continually expressed my interest in career advancement and the MIT program in her evaluations.

123.    By 2000, Ms. Renati had trained almost 20 managers in Marketing, all of whom were male, and many of whom never went through the MIT nor were never required to relocate. Some of the men she observed who got into management or the MIT without having to relocate were: Dan Dugger—started as a Meat Cutter in my store later than Ms. Renati did and became a General Manager; Dennis Costa—promoted to Meat and Bakery Manager; Mike Medina—promoted to Bakery Manager; Ed Walker— promoted to General Manager; Rick Biegacki—promoted from Floor Team Leader to General Manager; Matt Johnson— promoted to Merchandise Manager; Larry Monroe promoted from Team Leader to Merchandise Manager; Chad Hague—promoted from Floor Team Leader and to Center Floor Manager. Even so, Ms. Renati continued to express an interest in advancing into management and was eager to learn all she could in order to increase her chances of promotion.

124.    In 2000 while still Marketing Team Leader, Ms. Renati was out for six weeks getting

knee surgery. While Ms. Renati was out, Ms. Kirkpatrick and Regional Sales Manager

Theresa Hagensen called to tell Ms. Renati that they were combining marketing

departments and getting rid of her position. She again asked about becoming Manager

of the department that was being created but they told her that the position had been

given to a male, Larry Turner. Ms. Renati was told she could return only as a Cashier,

Meat Wrapper, Cart Runner or Telemarketer. Ms. Renati chose Meat Wrapper. Later

that year, Ms. Renati was out sick for a few days due to a cold. When she returned,

Meat Manager Jim Ross and Ms. Kirkpatrick informed her they had hired a less

experienced male, Rusty Ocheltree, to replace her as Meat Wrapper and that they were

moving her to the Membership Desk. Ms. Renati discovered that her supervisor at the

Membership Desk was someone whom she had previously supervised for six years.

Frustrated with lack of advancement, in September 2000, Ms. Renati left Sam's Club

and noted in her Exit Interview that it was due to a lack of promotional opportunities.

125.    In May 2001, Ms. Kirkpatrick contacted Ms. Renati and asked her to return to Sam's

Club to sell credit at the Membership Desk. Ms. Renati specifically inquired about

opportunities for future advancement, making it clear that this was a condition for her

return. Ms. Kirkpatrick assured her that, with Ms. Renati's experience, she would

definitely be given opportunities for promotion. With that assurance, Ms. Renati

returned to Sam's Club in June 2001 to sell credit.

126.    In early 2002, Ms. Renati applied for a position for Photo Manager. Ms. Renati did not

receive an interview and a male, Brett, who had no management experience and who

had only been with Sam's Club for six (6) months as a Cashier, got the position. A few

months later, Brett left and the position came open again. The position was not posted.

127.   Ms. Renati spoke with Assistant Manager over the Photo Department Michael Hasley

(Director of Operations Bob Alderman's neighbor who had originally been hired as

Marketing Manager and who had since been promoted) about this position and he told

Ms. Renati that she was qualified and he offered her the position.

128.   About one month later, a male who transferred from another Sam's Club, was given

the position. Ms. Renati spoke with Mr. Hasley about why she did not get the position

and he told her it was up to the General Manager. Ms. Renati spoke with Ms.

Kirkpatrick and she just told her that the position had been filled.

129.   Ms. Renati then spoke with Director of Operations Phil Goodwin again about her desire

to move into management and the fact that she had spent nine (9) years working at

Sam's Club with little advancement. All of her evaluations (including those before she

left in 2000 and after her return in 2001) were excellent. She had also never received

any coachings.

130.   Mr. Goodwin then asked me if Ms. Renati if she could stack 50-pound bags of dog

food. When she told him she could not repeatedly lift 50 pounds, he told her there was

nothing he could do for her because, before she could become a manager, she would

have to be Floor Team Leader and that requires stacking 50-pound bags of dog food.

However, Ms. Renati was aware of several males, including Mr. Hasley and Mr.

Jensen, who never had to become Floor Team Leader and stack 50-pound bags of dog

food before going into management. Ms. Renati had also never seen any written job

description with this lifting requirement.

131.    In April 2002, after repeated attempts to move up at Sam's Club, Ms. Renati again spoke with Ms. Kirkpatrick about career advancement. In that conversation, Ms. Kirkpatrick conceded that it was unlikely that Ms. Renati was going to advance in my career at Sam's Club. Ms. Renati tried to speak with her again a month later, but she stated she was too busy.

132.    When Ms. Renati left Sam's Club in August 2002, she made it clear that she was leaving Sam's Club due to a lack of promotional opportunities.

133.    During employment, Ms. Renati was paid less than other similarly situated men during her employment within Region 16. For example, Tom Olsen, one of Ms. Renati's subordinate Outside Sales Representatives who she had interviewed for employment and who was subsequently hired, informed her he earned approximately $5.00 more than her. He was compensated more despite less experience and a subordinate position.

**Region 16**

**Plaintiff Cheryl Noone**

134.    Plaintiff Cheryl Noone began her employment with Wal-Mart in 1995 and worked until 2006 at Store 2277 in Clovis, California.

135.    Prior to joining Wal-Mart, Ms. Noone had attended college courses at West Coast Occupational College and gained retail experience working at K-Mart for three years, Macys, JCPenneys, in a dental lab, and as an antique refinisher.

136.    Ms. Noone applied for general employment with Wal-Mart and was placed into the position of domestics sales associate.

137.    After three (3) years of employment at the associate level, Ms. Noone was promoted into the position of Department Manager in 1998.

138.    Throughout her employment, and until her separation, Ms. Noone sought opportunities for promotion, including Support Manager and Management in Training, but to no avail. Instead, Ms. Noone was asked to train males coming straight from high school for management positions above her.

139.    Ms. Noone would be subjected to comments by managers that the men had "families ti provide for," but Ms. Noone had a family of her own to care for as well. She spoke to her immediate manager, Assistant Manager Dominic about her aspirations for the Management in Training program and he laughed her off, telling her to "not even bother." While Ms. Noone had seen some females have opportunities for promotions to the Management in Training in her early career, after Dominic's comment, she saw males primarily getting promoted.

140.    When Ms. Noone sought opportunities in promotions in the Pet Department, her managers would tell her that the pet department was "too heavy for a woman," however, as a mother with young children, Ms. Noone was familiar with carrying cribs and children around and would have had no problem with any lifting requirements.

141.    As a Department Manager, Ms. Noone would receive a $0.25 cent raise, but learned that her male subordinates were making more than her, despite no prior experience in retail, like her.

142.    She also learned that male Department Managers in the same position as her were making more than what she was making, including. Lyle Neely and Chris Armendariz. Ms. Noone raised her concerns about pay discrepancy with her manager Mr. Krehbiel and later with her District Manager Mr. Smoot, but never got an answer as to why they

were making more. Instead, Mr. Krehbiel told her to "be patient. It will come." Mr. Smoot responded, "What do you want me to do about it."

143.   Upon information and belief, Ms. Noone believes she was paid less than other similarly situated men during her employment within Region 16.

**Plaintiff Carol Milse**

144.   Plaintiff Carol Milse was employed with Wal-Mart from July 1997 to July 2002 and worked during that period in Store 1905, in Yucca Valley, California which is in Wal-Mart Region 16 in the positions of Sales Associate and Department Manager.

145.   Prior to joining Wal-Mart, Ms. Milse gained retail experience for years working as a cashier at KTA Market, as a sales person working at Drug Fair in Iowa, in positions selling Tupperware as well as experience working in a clothing store. Ms. Milse also owned her own real estate management/apartment management company managing about fifty (50) apartment units for eight (8) years and was an office manager at a resort in Hawaii.

146.   From the beginning of her employment, Ms. Milse expressed interest to management to move up the corporate ladder. At her initial interview, she was encouraged for these prospects when she was told she was overqualified for an associate position, but she was eager for the opportunity to work with the company. She began as a part time associate in the shoe department and continued for approximately two years until her promotion to Department Manager, which she had been seeking and applying to multiple positions until she was promoted, including opportunities in houseware, health and beauty, infants, and toys.

147.   Once Ms. Milse earned the position of Department Manager of Stationary, she inquired of opportunities to be promoted to Support Manager and into the Management in Training program. Ms. Milse discussed her aspirations with her Store Managers and Assistant Managers as well as her District Manager David Simmons, who she told she wanted to be a store manager one day. In response, Mr. Simmons simply replied "that's nice." In fact, every time Mr. Simmons came to the store, Ms. Milse used the opportunity to discuss with him her desires for promotions.

148.   However, the positions were not posted and Ms. Milse watched as lesser experienced males were placed into these positions, instead. Finally, a position was posted for Management in Training around 2001 or 2002. Ms. Milse applied and never heard anything further. Instead, less experienced males were placed into the positions.

149.   During Ms. Milse's employment, and while she was in the position of Department Manager around 2002, she learned that her male counterparts made approximately $2.00 more than her per hour.

150.   Upon information and belief, Ms. Milse believes she was paid less than other similarly situated men during her employment within Region 16.

**Plaintiff Michelle Tyrell**

151.   Plaintiff Michelle Tyrell was employed by Wal-Mart from 1996 to 2003 and worked during that period in Store 1887 in Montoursville, Pennsylvania, and Store 1588 in Victorville, California which is in Wal-Mart Region 16.

152.   Prior to joining Wal-Mart, Ms. Tyrell attended community college and then joined the U.S. Army until her discharge in March 1995 due to injury.

153. Ms. Tyrell applied for a position with Wal-Mart and was placed part-time into the jewelry department as an associate. When she transferred from Store 1887 to Store 1588, she did a lateral transfer to associate and later, she earned the position of Department Manager of the Jewelry Department.

154. During employment, Ms. Tyrell learned that her male counterparts were making more money than her, despite similar experience. For example, she learned that Patrick, who was an associate and then was a Department Manager (like her) in the Fresh Department, was making more money, around $16.00 per hour, while she was only making $12.00 per hour. She learned Oscar and Brandon, who were in a similar associate position, were making amounts at the same as Patrick and more than her, despite less or similar experience.

155. Ms. Tyrell expressed her interest to move into the Support Manager position to her supervisor Wendy, telling her she wanted to move to the next level, and talked to management about her aspirations to eventually hold the District Manager position. She then found out Patrick received the Assistant Manager position, and she had not even been informed the position was available nor was there a job posting. Instead, one day, Ms. Tyrell arrived to work to see Patrick wearing a "Assistant Manager" nametag.

156. Ms. Tyrell was subjected to unwanted touching by her Assistant Manager, Ray.

157. Ms. Tyrell tried to discuss her concerns about unequal pay with her District Manager, to no avail.

158. Eventually, Ms. Tyrell went on stress leave due to lack of opportunities and unequal pay and separated her employment.

159.    Upon information and belief, Ms. Tyrell believes she was paid less than other similarly situated men during her employment within Region 16.

**Plaintiff Denise Van Galder**

160.    Plaintiff Denise Van Galder was employed by Wal-Mart from October 29, 1998, to August 9, 2008, in Bakersfield, California Store 2557 which is in Wal-Mart Region 16. She was employed in the positions of hourly associate, Department Manager, and Support Manager.

161.    Prior to joining Wal-Mart, Ms. Van Galder attended Bakersfield College. She also served in the U.S. Army in the rank of Specialist 5.

162.    Between 1998 to 2004, Ms. Van Galder worked her way up from hourly associate to Department Manager, and had aspirations to continue with her career at Wal-Mart. In 2004, Ms. Van Galder began inquiring about opportunities with management and applying for Support Manager positions. Despite her qualifications, Ms. Van Galder never received an interview, and each time, a less experienced male was selected for the position.

163.    In 2007, Ms. Van Galder applied for the Management in Training program through the online computer system. Instead, she was transferred to night shift Support Manager.

164.    Around October 2007, Ms. Van Galder was offered the Toys Department and told that if she stayed in the position through Christmas, she would be the next person in line to be promoted to the Management in Training program

165.    On or about April 28, 2008, and one week before the training program was opened for applicants, Ms. Van Galder was called to the Store Manager's office and accused of having an "attendance problem." Yet, the manager could only point to one day where

Ms. Van Galder was absent – and that was December 27, 2007. Not only had Ms. Van Galder never been disciplined for the absence before, she was on a leave of absence at that time (until December 28, 2007), and therefore, not even scheduled to work on December 27, 2007.

166.   Ms. Van Galder was told that she would have to wait six (6) months with a perfect attendance to be considered for any other promotion.

167.   Meanwhile, on at least two occasions, Ms. Van Galder watched as men with poor attendance records were promoted to the Management in Training program without issue.

**Plaintiff Mavi Alulquoy**

168.   Plaintiff Mavi Alulquoy began employment with Wal-Mart in the Santa Maria Store Number 2507.

169.   Ms. Alulquoy worked her way up from associate to Department Manager.

170.   During her employment, she was recognized for her hard work, winning nearly every accolade available to her at her store while working as a Department Manager in Housewares, Chemicals, and Health, Beauty, and Aides. Ms. Alulquoy's efforts results in million dollars of sales in her departments.

171.   Ms. Alulquoy then applied for the Management in Training program, but watched as less experienced males were promoted over her, including George (Department Manager of Chemicals), Brian Rhodes (Department Manager of Paint), and Tim (Department Manager of Paint), who were all Department Managers with her.

172.   This was despite these same male Department Managers not being able to complete their job duties, and Ms. Alulquouy, and the only other female Department Manager,

Valerie Cooke, being ordered by their male Assistant Manager, David Martinez, to go to the men's departments to help them to complete their job duties, like bringing out their freight, including for George, Mr. Rhodes, and Tim. Both Ms. Alulquouy and Ms. Martinez were able to complete their job duties as well as assist the males.

173.   Often times, Ms. Alulquouy and Ms. Martinez would be asked by George to help him with his other job duties as well, as he was unsure how to complete his job responsibilities.

174.   Both Ms. Alulquouy and Ms. Martinez were voted by their peers as Department Managers of the year, and Ms. Alulquouy was invited to Bentonville, Arkansas to be recognized for her work.

175.   Ms. Alulquouy became frustrated by the lack of promotional opportunities and complained to her Assistant Managers Mr. Elter and Mr. David Martinez about her desires for promotion and to have her own store as a Store Manager.

176.   Instead, Mr. Martinez placed Ms. Alulquoy on the night shift.

177.   When Ms. Alulquoy expressed interest in promotional opportunities, managers would say that women needed to "have babies instead of lifting crates" or she should "be out having babies, not busting in here."

178.   Ms. Alulquoy was determined to prove them wrong, often working straight through lunch outworking her male coworkers.

179.   When it was clear that there were no promotional opportunities for Ms. Alulquoy, she left Wal-Mart in 16.

180.   During employment, Ms. Alulquoy was paid less than other similarly situated men during her employment within Region 16.

181. By way of example, Ms. Alulquoy worked with a Department Manager, Tim, and learned that he was paid more than her, despite Ms. Alulquoy being required by Mr. Martinez to help him with his work duties, as well as being paid less than Department Manager George, who told her that he was making more than everyone else around him (which included Ms. Alulquoy). She also learned that men in subordinate positions were compensated more than her, like Bob, who was in the position of People Greeter.

**Plaintiff Pamela McClelen**

182. Plaintiff Pamela McClelen was employed by Wal-Mart from 1991 to 2001 and worked during that period in Stores 1574 and 1600 which are in Wal-Mart Region 16 working in the positions of cashier, stocker, and sales associate.

183. During employment, and from 1998 through the end of her employment, Ms. McClelen sought promotional opportunities to the position of Department Manager while working in Store 1574.

184. However, Ms. McClelen watched as the positions were given to less experienced males who had only been with the company for months.

185. When Ms. McClelen complained about the lack of promotional opportunities, she was told that the males who were promoted above her had more experience than her, but she was aware that they did not.

186. Instead, Ms. McClelen learned that new male hires who had less experience were brought in to comparable positions as her, but paid more money.

**Plaintiff Rita Weisz**

187.   Plaintiff Rita Weisz was employed by Wal-Mart from March 1999 until October 2000, and worked during that period in Store 2621 in Simi Valley, California, which is in Wal-Mart Region 16.  She was employed as a Department Manager.

188.   Prior to joining Wal-Mart, Ms. Weisz earned her high school diploma and studied college level courses. She gained job experience working on computers.

189.   Ms. Weisz began as a Department Manager.

190.   During employment, around 2000, Ms. Weisz expressed interest in the Management in Training program. At the time, she had received several awards for high sales and job performance as a Department Manager. When she asked about opportunities for Management in Training, management said that "as a mother" the hours would be "too long" for her and have too many responsibilities or that she was "a mother with a child" and would not handle a position like that. She learned that management had approached her male Department Managers and offered for them to be an Assistant Manager, but they turned down the opportunity due to not wanting the workload. One of those male Department Managers, who was in charge of Hardlines, suggested Ms. Weisz for the position, to no avail.

191.   As a result of being blocked from promotional opportunities, Ms. Weisz separated her employment in October 2000. At the time Ms. Weisz submitted her resignation, her District Manager begged her to stay on with her employment. Ms. Weisz offered to stay on, but only if she was finally promoted to the position of Assistant Manager. Her District Manager told her that she could give her an increase in pay, but not a promotion because she was a woman and would not be able to handle the position.

192.   During employment, Ms. Weisz learned she was paid less than other similarly situated men during her employment within Region 16, including the other male Department Managers. This was despite Ms. Weisz having the highest sales in her district and being the recipient of accolades for her performance. She was also chosen to assist with setting up a new store.

**Plaintiff Sharon Reese**

193.   Plaintiff Sharon Reese was employed by Wal-Mart from January 14, 2003, to November 2006 and worked during that period in Store 2960 in Baldwin Park, Los Angeles, California, which is in Wal-Mart Region 16, and Store 5072 in South Bay, Torrance, California, which is in Region 16.  During employment, she held positions of associate, Department Manager in Stationary and Pets Department, and Support Manager while in Store #5072.

194.   Throughout her employment, Ms. Reese was recognized for her stellar work performance, even being offered the opportunity to fly to Little Rock, Arkansas to be recognized at the Shareholder Meeting for her outstanding work performance.

195.   Ms. Reese began her employment with Walmart in Store 2960 in the Toys Department. At that time, she discussed her promotional desires with her Store Manager Michael Hardaway, specifically telling him that she wanted to join the Management in Training program. She asked Mr. Hardaway what she needed to do to position herself for a promotion, but he simply told her that if she completed a full year in Toys, she woud be promoted to Department Manager in that department. Ms. Reese worked in Toys while also cross-training in other areas of the store to prepare herself for a promotion. While she did not hold the title of Department Manager, she took on Department

Manager responsibilities throughout the year. At the end of the year, she was proud that her Toys Department sales were up. She earned a positive performance review. However, instead of promoting Ms. Reese to the Department Manager position of Toys, the position was given to a new male associate Matthew, who had been working as a stocker in the basement and had no experience in the department or anywhere on the sales floor. Ms. Reese was asked to train Matthew to do the job.

196. While employed, and around January 2003, Ms. Reese was making approximately $7.50 per hour. On or about January 2004, she earned the position of Department Manager and earned about $9.00 per hour. Around 2004, Ms. Reese learned that Matthew, who was hired around the same time as her at Store 2960, was making $10.00, even though he had substandard performance and had been fired from Wal-Mart on three (3) separate occasions, whereas Ms. Reese received position evaluations and had been working for the company for over a year and a half. Ms. Reese was paid $9.00 for the same work and job responsibilities. Her highest rate of pay was $11.24.

197. Other males in similar positions would show her their paychecks to brag that they were making more. Ms. Reese was aware that they had performance issues, but they were still compensated at a higher rate than her. She complained to management and was told by WC Morrison that men needed more money to pay for their families.

198. As a Department Manager, Ms. Reese applied on at least three (3) or four (4) separate occasions for the position of Management in Training program while employed at both stores, though the openings for the MIT program were never posted. Ms. Reese would register her interest and wait for management to approve her application and submit her name. However, each time, management promoted a lesser qualified male into the

program. Her goal was to become an Assistant Manager and Ms. Reese repeatedly told her. Store Managers, including Michael Hardaway, W.C. Morrison, and James Bendari, that she was interested in management. However, she never was given an opportunity to move beyond Support Manager. Ms. Reese made requests to her Assistant Managers to crosstrain her in different areas of the store, as she was told that it could increase her chance of being promoted to management, but they refused to provide the training.

199.    Instead, Ms. Reese was told that she was intimidating men in similar positions because she was better at doing her job.

200.    Ms. Reese observed that she and her female coworkers would be assigned to departments with lower volumes and less margins, like her assignment in Stationary, whereas her male coworkers would be assigned to departments like electronics and hardware, which provided fast tracks to promotions.

201.    Ms. Reese educated herself with the printouts of the sales reports so she could understand the reports and increase her likelihood for promotions. This lead Ms. Reese to complain to Wal-Mart's corporate office's 1-800 hotline in June 2005 of unfair treatment of women. In her complaint, Ms. Reese expressed concern that male employees were treated better than female employees, that the male managers got more associates to help in their departments, and women had insufficient support. No one in management ever addressed Ms. Reese's complaints. Ms. Reese then went to her local management in Store 2960 to complain about Wal-Mart's unfair treatment of women and was called a "Corporate Snitch" by her Store Manager during a store meeting. Ms.

Reese was fearful of further retribution and made a request for a store transfer. She was assigned to 5072.

202.   Upon arriving to Store 5072, Ms. Reese was approached by Assistant Manager Robert Eubanks who told her to watch her back because the managers in their store were aware of her complaints and would be looking for ways to get rid of her or set her up in a position to fail.

203.   Despite this, Ms. Reese continued to express interest in promotional opportunities, including by discussing her aspirations with Store Manager James Bendari. Eventually, she was promoted to Support Manager and given keys to open and close, which was normally an Assistant Manager's duty.

204.   Around April 2006, Ms. Reese applied for the MIT program. Mr. James Bendari told her that she could attend the program. However, just two (2) weeks later, Mr. Bendari told Ms. Reese she would not be promoted and instead, he would be promoted a male Department Manager into the program, who had only worked for Wal-Mart for two (2) months and previously fired from his employment. Ms. Reese complained to Mr. Bendari about the discrimination, but nothing was done.

205.   Later, Ms. Reese again applied for the MIT program. However, again, management promoted a male employee who only had ten (10) months' of experience with Wal-Mart.

206.   Ms. Reese separated employment in 2006.

207.   Upon information and belief, Ms. Reese believes she was paid less than other similarly situated men during her employment within Region16.

**Plaintiff Gina Portillo Vierra**

208.    Plaintiff Gina Portillo Vierra was employed with Wal-Mart from 2003 to 2005 in Store 1760 in Folsom, California in the position of Inventory Control Specialist.

209.    During employment, Ms. Vierra sought and applied for managerial positions on at least two (2) occasions, but was passed over by less experienced males.

210.    After Ms. Vierra was passed over for promotions, she left the company in 2005.

211.    During employment, Ms. Vierra was paid less than other similarly situated men during her employment within Region 16. More specifically, in the position of Inventory Control Specialist, she worked with a male employee named Miguel, who had less experience than her and who was hired into Wal-Mart after her, but she learned from him that he was paid more than her. Similarly, she trained a male named Dennis for the Inventory Control Specialist position, but learned that he was compensated more than her, despite her advanced experience.

**Plaintiff Cheryl Stout**

212.    Plaintiff Cheryl Stout was employed with Wal-Mart from October 2000 through May 2007 in Store 1660 in Palmdale, California and also temporarily in Victorville, California store.

213.    As a cashier and continuing through Ms. Stout's employment, she learned that similarly situated males were paid more than her, despite similar or less experience. For example, Ms. Stout's highest rate of pay was $9.47 as a Customer Service Manager (CSM) in 2002.

214.    Around 2001, Ms. Stout learned from her male coworker, James, who also worked as a cashier like her, that he was earning somewhere from $0.50 to $1.00 more than her, while Ms. Stout was making $8.30 per hour.

215.    Ms. Stout made a complaint about the pay differential to her Assistant Manager Clevan McCrae, who told her that James earned more money because he had a "family to support."

216.    While  working in temporarily Victorville, California in late October/early November 2003, Ms. Stout was working as a CSM in the Sporting Goods Department. While she was working with another male CSM, who was temporarily working in Victorville, like her, but from the store Hesperia, California, he informed her that he made $1.50 more per hour, despite same or similar experience.

217.    Ms. Stout made her promotional aspirations clear to her management. Each time she learned of an opening for a CSM position, she applied. She learned about the openings from word of mouth or when the postings were occasionally posted in the hallway employee area of the store. In total, of times there was actually an application process available, Ms. Stout made applications for the CSM position at least eleven (11) times until she was finally promoted in 2002. She never learned why she was not promoted the previous ten (10) times or given information of how to become promotional. She had the qualifications, but got passed over each time.

218.    Once she had achieved the role of CSM, Ms. Stout was interested in management in training. She expressed her interest to management, including Assistant Manager Dawn Turner in 2003, but was never given information about how to enter the program.

219. In the role of CSM, Ms. Stout exceled and was asked by management to train a recently promoted CSM, Michael Varelas. Ms. Stout learned from Assistant Manager Vivian that Mr. Varelas applied for the CSM position at the same time as Ms. Stout, when she was finally selected for the position, but that he got a lower ranking that Ms. Stout.

220. Nonetheless, Ms. Stout learned than within one (1) to one and a half (1.5) years of her becoming a CSM, that Mr. Varelas was promoted over her into the management in training program and then into Assistant Manager, where she was assigned to a store in a neighboring town, less than ten (10) miles from their store.

**Plaintiff Shannon Stephenson**

221. Plaintiff Shannon Stephenson was employed with Wal-Mart from 1987 to January 20, 2004 in the Rialto, California Store, the Glendora, California, store, the Fresno, California store, and the Apple Valley, California Store number 2333. During employment, she worked in the positions of Department Manager, Customer Service Manager, Support Manager, and TLE Department Manager.  Prior to Wal-Mart, Ms. Stephenson was a Journeyman from 1960 to 1983.

222. During employment and from 1996 onward, Ms. Stephenson was promised the opportunity to be promoted to Assistant Manager while she was working in both the Fresno Store and Store Number 2333.

223. Ms. Stephenson was promised if she performed certain tasks, she would be promoted. Ms. Stephenson followed directions, but never saw positions posted.

224. Instead, Ms. Stephenson watched as less experienced males were promoted over her.

225. Still, she continued to express interest in the Assistant Manager Training program, but was never selected.

226.   During employment, Ms. Stephenson learned she was paid less than other similarly situated men during her employment within Region 16. For example, she learned that Daniel Stephenson was employed in a subordinate position to her - a cart pusher, but offered more money than she was making in the Department Manager position, despite her advanced experience and responsibilities. Mr. Stephenson was eventually promoted to her position, Department Manager, and he continued to make more than her. She learned from other Department Managers, like Bill Williams, Hardware Department Manager, that he was paid more than her, despite same or similar experience.

**Region 19**

**Plaintiff Kristin Marsh**

227.   Plaintiff Kristin Marsh was employed by Wal-Mart from 1994 until July 17, 2007, and worked during that period in Store 2002 in Gilroy, California which is in Wal-Mart Region 19 and Store 2458 in Salinas, California, which is in Wal-Mart Region 19.

228.   Prior to joining Wal-Mart, Ms. Marsh attended cosmetology school and had ten (10) years' experience working in the automotive field, including doing service writing.

229.   Ms. Marsh began her employment with Wal-Mart in the cash office. After a short while, Ms. Marsh ended her employment in October 1994, only to return to work at Wal-Mart in January 1998, in the Tire Lube Express department as they were looking for someone who "knew cars," and Ms. Marsh did.

230.   Her employment was not welcomed by her male coworkers, as she regularly arrived to the department after her uniform was delivered to find it slashed with razors. Ms. Marsh complained about the hostile treatment to her Store Manager and TLE Manager Rod

Johnson. She was moved to work inside the store from the oil change area to inside of TLE.

231.   Ms. Marsh worked her way up to the Department Manager position, but became stunted in her promotional aspirations when she sought the position of Support Manager. Instead, she watched as male Support Managers were promoted over her, but she found herself doing their job duties and training then. Ms. Marsh then transferred to the Salinas, California Store and worked under Jeff Mcumbre. Again, Ms. Marsh worked her way up from a sales floor associate to Department Manager in TLE.

232.   During the time of her employment, she worked under a total of seven (7) TLE Managers, who were all males.

233.   Around 1999, Ms. Marsh approached her District Manager Edward Brockman and expressed interest in the Management in Training program. She wanted to be the TLE Manager. Mr. Brockman responded, "but, aren't you a single mom?" Ms. Marsh was stunned and asked, "don't you have single moms in the program?" Mr. Brockman told Ms. Marsh it would be "a lot of traveling" and that the position might not be right for her.

234.   Eventually, Ms. Marsh's department was taken over by a new District Manager, Alfredo Coronado.

235.   Mr. Coronado learned that Ms. Marsh was dating a laterally-placed coworker. He called both Ms. Marsh and her coworker into the office and asked if they "were together." When they confirmed that they were dating, Mr. Coronado explained that one of them had to transfer out, and it was going to be Ms. Marsh. When Ms. Marsh complained about Mr. Coronado's actions, which she understood were against Wal-Mart's policies,

she prevailed. Mr. Coronado then came to the office the next day to give her a coaching. She learned that her male, laterally-placed coworker was also making more than her.

236.   Ms. Marsh then separated employment in 2007.

237.   Upon information and belief, Ms. Marsh believes she was paid less than other similarly situated men during her employment within Region 19.

**Plaintiff Darla Harper**

238.   Plaintiff Darla Harper was employed by Wal-Mart from 1995 to 2005, and worked during that period in in Washington State as well as Pittsburg, California Store 1615.

239.   Prior to Walmart, Ms. Harper gained educational experience attending a medical training program and earning a Medical Assistant Degree. She was employed at a family practice medical office where she was responsible for front and back office duties, medical coding and transcription. She was also employed at a pediatric care facility in Washington and prior to that career, Ms. Harper was an Assistant Manager for an AW Hamburger Stand while in high school.

240.   Ms. Harper was enthusiastic about the opportunity to join Wal-Mart part-time while she maintained her medical assistant employment. She applied for general employment and was placed into an associate position in the jewelry department in Auburn, Washington, around October 1995.

241.   Almost immediately into her employment with Wal-Mart, Ms. Harper was provided the opportunity to work in jewelry inventory, which opened doors for her to work on inventory at other Wal-Mart stores alongside her jewelry Department Manager and her Store Manager.

242.   Promised promotional opportunities and career advancement, Ms. Harper left her career in the medical field to pursue a full time career with Wal-Mart.

243.   Ms. Harper's inventory responsibilities required travel away from home for three (3) to five (5) days per week.

244.   Despite the long hours she worked, Ms. Harper found she was only getting paid for a 40 hour workweek. When she began questioning management about why she was not getting paid for all the hours she was working, she was removed from working in jewelry inventory. Instead, she was placed into an associate position in the Auburn, Washington hardware department.

245.   Ms. Harper remained hopeful that the promotional opportunities she was promised would come, but was discouraged when she was placed into an associate position in the Auburn, Washington hardware department. She questioned management when she would have the opportunity to be promoted and was told that in order to "move up" she needed to "cross train." Ms. Harper obliged and began crosstraining, first from the hardware department, then to softlines and making her way to associate positions in different departments throughout the store.

246.   Around 1997, Ms. Harper and her family relocated to California and she was transferred into Store 1615, in Pittsburg, California, where she was placed as an associate in softlines.

247.   During employment, Ms. Harper's female Store Manager inquired about her interest in management, and. Ms. Harper explained this was always her goal. She was placed into a management position.

248.  Ms. Harper was told by management that if she wanted to move up further, she could

not miss work. Ms. Harper was pregnant with her child and gave birth two (2) days

before Thanksgiving. Management told Ms. Harper she needed to be at work on

Black Friday if she "wanted to climb up." Two days after giving birth, Ms. Harper

reported back to work at 5:00 a.m. for Black Friday.

249.  Throughout her employment in Store 1615, Ms. Harper always took any opportunity

she had with conversations with management to express her desire to move up,

including into the Management in Training program and Assistant Manager position.

250.  Much to her dismay, the response she would get from her Assistant Managers, like

Bob, was that she would "never make it in this company because you're a female."

Ms. Harper did not want to believe his statement, so she continued to work hard with

the hope of moving ahead – sometimes working back to back shifts for as many as 24

hours in a row. Despite the many awards, pins, plaques, and accolades she received,

she found herself getting passed over for promotional opportunities by less

experienced males, including for the Support Manager position she was seeking.

Instead, she was asked to train the males. Some of the men promoted over Ms. Harper

were men she hired into working at Wal-Mart while she was on the hiring committee.

On another occasion, a male coworker who was an overnight stocker was promoted to

the Support Manager position, while Ms. Harper, a Department Manager, was not.

251.  Ms. Harper learned the males she was training were getting paid more than her,

despite just being employment with Wal-Mart.

252.   When Ms. Harper complained to her male Assistant Manager about the pay disparity in 2002, she was told that "this is why you can't be in management," "you females are too emotional."

253.   On another occasion, her Store Manager Ken Kagle said that if she wanted something "from him" (a promotion), he needed something from her. Mr. Kagle asked Ms. Harper to make a statement that she was present during a coworkers' at-work injury in defense of the coworkers' workers' compensation claim. Ms. Harper was not present at the time of the injury and refused to lie for Mr. Kagle and, in turn, he did not consider her for a promotion.

254.   Often times, Ms. Harper would wait for her desired promotional position to be posted, only to be introduced to a new, male, Support Manager who received the position, like her coworker Larry– without any notice to Ms. Harper or her coworkers that the position was available. Ms. Harper was aware that Larry had never run another department, like she had.

255.   After years of seeking promotional opportunities to no avail, and complaints about lack of promotional opportunities by Ms. Harper and her coworker Betty Dukes, Ms. Harper separated her employment with Wal-Mart on or about December 2005.

**Plaintiff Hope Garcia**

256.   Plaintiff Hope Garcia was employed by Wal-Mart from November 1999 to February 2001 and worked during that period in Store 2524 in San Jose, California, which is in Wal-Mart Region 19.

257.   Prior to joining Wal-Mart, graduated from high school in San Jose and began employment at an electronics store assembling PCs and working in shipping and

receiving. Ms. Garcia then became employed with FMC Machinery and gained experience building Army Tanks for five (5) years and then also building pumps for the ocean with BW/IP for approximately three (3) years. Subsequently, she became employed with Allied Security, securing banks and buildings and was specially trained in security and later with Industrial Security for San Jose's Minteta Airport and Asset Insurance securing high rise buildings. Through security positions, she also has held a guard card since 1995.

258.   Ms. Garcia made a general application to work at Wal-Mart and was placed into the fabrics department in an associate position, but as soon as she was to begin her employment, she was told that her position was changing to work in Security, driving a patrol car, where she remained during her entire employment making $7.00 per hour.

259.   Ms. Garcia sought advancement opportunities at Wal-Mart by applying to the Warehouse where she could work in shipping and receiving, but the male Lead managers, Tom, told her that it was a "guy's job." Ms. Garcia protested and told him she could handle the position, but she was never hired. She followed-up by talking to other male employees in shipping, like Victor, and told them what Tom told her about the department being a "man's job." They agreed.

260.   While employed, Ms. Garcia came across another employee's paystub, Rolando, and learned that her male coworker in security were making more than her.

261.   Ms. Garcia discussed the check stub with Edna, the manager who hired her into her position and asked why Rolando was making more money than her. Edna replied that Rolando was "different."

262. Ms. Garcia then complained to Martin, her District Manager, about the pay disparity. She asked him why Rolando was making more than her and he said he did not know why.

263. Ms. Garcia then separated her employment in 2001.

264. Upon information and belief, Ms. Garcia believes she was paid less than other similarly situated men during her employment within Region 19.

**Plaintiff Kathleen Wilkerson**

265. Plaintiff Kathleen Wilkerson was employed by Wal-Mart from April 12, 2000, to September 9, 2009 and worked during that period in Store 1979 in Clearlake, California which is in Wal-Mart Region 19.

266. Ms. Wilkerson was employed from April 12, 2000, until September 9, 2009 in the Clearlake California store, Number 1979, holding positions of hourly associate and Department Manager.

267. Around 2001, while Ms. Wilkerson held the position of Department Manager she expressed interest in promotional opportunities, including Management in Training and Support Manager. She was told by management that she would be promoted to Support Manager and she began to be provided opportunities to cross train in different departments for Management in Training, working in nearly every department in the store.

268. However, when a Support Manager position became available, Ms. Wilkerson's manager promoted a male cart pusher who only had three (3) months of experience with Wal-Mart.

269.   Ms. Wilkerson complained about being passed over by a less experienced male to her Store Manager Armando through an "open door" complaint, but nothing came of it.

270.   During employment, Ms. Wilkerson was promised she was "in line" to join the Management in Training Program by her female Store Manager. However, her female manager then got transferred out of the store and instead, she watched as she was passed over for the opportunity in favor of males with less experience than her.

271.   Ms. Wilkerson learned that her male counterparts were getting paid more than her and getting more raises, especially under management of Store Manager Armando, but was concerned about complaining as Wal-Mart maintained a policy that discussing pay was against company policy and she was worried about losing her job.

272.   Upon information and belief, Ms. Wilkerson believes she was paid less than other similarly situated men during her employment within Region 19.

**Plaintiff Jennifer Seely[3]**

273.   Plaintiff Jennifer Seely was employed by Wal-Mart from January 18, 2007, until December 21, 2009, and worked during that period in Store 2553 in Windsor, California, which is in Wal-Mart Region 19. During employment, she worked in the positions of Sales Associate in the Electronics Department, Soflines and door greeter.

274.   Prior to joining Wal-Mart, Ms. Seely gained employment experience working at Subway and also as a caregiver doing home support. She also earned her college degree.

---

[3] In response to this Honorable Court's Order on the Defendant's Motion to Dismiss (DE 55), Plaintiff Seely only asserts claims for pay discrimination. The supporting facts regarding discrimination on the basis of denial of promotions are provided for background only.

275.   While employed, Ms. Seely was regularly required to clean the department by her male managers, but no males were asked to clean.

276.   During employment, her male coworkers showed her their pay and she learned it was more than her, despite that they worked in the same position and Ms. Seely had a college education and years of work experience and they had none. Ms. Seely saw her male coworkers' paychecks and learned that they were making more than her, despite that her customer ratings were higher and she received letters from customers praising her work. When Ms. Seely complained to management about the disparity, she was told it was because the men "could lift things." She was told so that it was against company policy to discuss wages, so the managers would refuse to make a record of her complaints.

277.   Ms. Seely would be assigned duties like answering phones as part of her job by her manager, who said answering phones was "women's work." Ms. Seely observed that she and her female coworkers would be scheduled for less desirable shifts, like Black Friday, while the men would receive preference to have the day off.

278.   When Ms. Seely sought promotions, she would be told by her male Assistant Store Managers like Pavo and Chauncy, you're a woman you should actually work in the makeup department." While Ms. Seely was working late at night, Chauncy, her Assistant Store Manager, would block the doorway and tell her,  "if you wanna get out you have to give me a kiss"  and "what are you gonna do about it you're locked in and I have the key." Assistant Store Manager Chauncy initated a rule that Ms. Seely needed his permission to go to the bathroom. When Ms. Seely asked Assistant Store Manager Chauncy to use the restroom, he would respond "what you have to go change your

tampon?" He did not enforce the policy on men because he said it "takes men less time to use the bathroom."

279.    Ms. Seely was subjected to sexually harassing comments about her breasts by her coworker Ricky who would make comments about her body several times per day and multiple times per week. Comments included "I really want to squeeze your boobs, it is hard to focus on anything else," and "are you putting on weight, because your ass is looking bigger?" Ms. Seely complained to management about the comments which made her uncomfortable and made it difficult to work. Instead, management ignored her complaints and shortly thereafter, instead of punishment, Ricky was awarded with the highest raise available.

280.    Ms. Seely made complaints about the discriminatory comments and treatment to her Store Manager Allen, but nothing was done.

281.    Ms. Seely separated her employment in 2009.

**Plaintiff Mary Quintanilla**

282.    Plaintiff Mary Quintanilla was employed by Wal-Mart from October 13, 2006, until 2015  and worked during that period in Store 1903 in Yuba City, California which is in Wal-Mart Region 19.  During employment, she worked in the associate position in the Deli Department as well as a cashier.

283.    Prior to working at Wal-Mart, Ms. Quintanilla earned her Associates' Degree, her Bachelor of. Science degree, and is now in the process of earning her Master's Degree. She joined Wal-Mart with the hopes of entering the Management in Training program and was initially placed in a part-time position in the Deli Department.

284. During employment, Ms. Quintanilla was making $10.80 while working in the deli as an associate, but found out two men hired after her, Sue and Yancy, made over $11.00 per hour. The men would tease her that they were earning more than her even though they started later and she had an associate's degree, but they did not.

285. During employment, Ms. Quintanilla sought opportunities to advance to Support Manager and Management in Training/Assistant Manager, but watched as nearly twenty (20) men were promoted over her, despite her expression of interest in a promotion and tenure with the company.

286. Specifically, Ms. Quintanilla inquired about promotional opportunities on at least three (3) separate occasions to join the Management in Training program, including in Summer 2007, November 2008, and December 2009. She also registered interest in the computer system, when available. On each occasion, she would told by management that they would "look into it," but nothing came of the position. Another time, she was told that the position would be "high demanding" and would be a problem for her due to her "obligation to her family." However, Ms. Quintanilla maintains a full time job, which includes working overtime hours, without issue.

287. Around 2007 when an Assistant Manager position became available, Ms. Quintanilla made an appointment with her Store Manager, Roy, to notify him of her interest in the position. Roy told her that she would first have to work in the position of Customer Service Manager (CSM) and "prove herself." Roy told her that if she completed CSM for six (6) months, she could be promoted to Assistant Manager. Ms. Quintanilla was working part-time and inquired if her hours would be a hinderance to advancement. Roy told her that her part-time status would not prevent her from being promoted, so

she maintained her hours and continued to seek the advancement opportunities, but was never given the opportunity for the CSM position.

288.   When Ms. Quintanilla got passed over again by a male for an Assistant Manager position and complained to management, she was told by Roy and then again by another Store Manager Melissa Durat that she did not get the promotion due to the "low hours she worked" each week. However, Ms. Quintanilla observed less experienced men who were promoted to the managerial positions who worked part time like her.

289.   Around 2008, Ms. Quintanilla again notified Melissa Durat of her desire for a promotion to management. Ms. Durat said she was putting together a list of people interested in promotion and that she would add Ms. Quintanilla to the list so she could receive preparation information about the interview and test. However, when Ms. Quinanilla inquired about the status of the preparation program, Ms. Durat always said she was "working on it." Ms. Quintanilla was never given any information about an interview or exam, and to her knowledge, she was not placed on any list.

290.   Even though she made my aspirations of becoming an assistant manager known to two store managers, Ms. Quintanilla was denied the opportunity to become a CSM even though having that position would have made her a more competitive candidate for an assistant manager position. Instead, she watched men, including those with less experience than her, receive training to work as a CSM while she have been denied the same opportunity for nearly seven years.

291.   She was also been denied the opportunity to work in the money center and courtesy desk, and saw men with a few months' experience been moved to those departments over her.

292. Since 2010, Ms. Quintanilla was aware that Wal-Mart had not posted open management positions in the store where she work. Although she knew of people who had been promoted since that time, she did not see a posting for an assistant manager position.

293. Ms. Quintanilla is currently employed.

## STATEMENT OF CLAIMS

### COUNT I—VIOLATION OF TITLE VII
### DISPARATE TREATMENT IN WAL-MART REGION 19
### PLAINTIFFS KRISTIN MARSH, DARLA HARPER, HOPE GARCIA, KATHLEEN WILKERSON, JENNIFER SEELY, AND MARY QUINTANILLA

294. Plaintiffs Kristin Marsh, Hope Garcia, Kathleen Wilkerson, Darla Harper, Jennifer Seely, and Mary Quintanilla worked for Wal-Mart in Region19.

295. Plaintiffs incorporate and reallege paragraphs 1 through 293 herein.

296. Wal-Mart denied Plaintiffs pay equal to that earned by similarly situated men, on the basis of gender.

297. Wal-Mart denied Plaintiffs Marsh, Garcia, Wilkerson, Harper, and Quintanilla equal opportunities for promotion to positions that they were qualified for and interested in, on the basis of gender.

298. Wal-Mart's conduct of engaging in discrimination against its female employees working in Region 19 by making compensation and promotion decisions on the basis of gender violates Title VII of the Civil Rights Act of 1964.

299. The Defendant has failed to comply with their statutory duty to take all reasonable and necessary steps to eliminate discrimination from the work place and to prevent it from occurring.

300.    Wal-Mart's discriminatory practices described above have denied Plaintiffs promotional opportunities and compensation to which they are entitled, in violation of Title VII.

301.    Wal-Mart's alleged reasons, if any, for the discrimination against Plaintiffs on the basis of gender is a mere pretext, as evidenced by the pattern or practice of discrimination against female employees generally.

302.    Plaintiffs have each exhausted all of their administrative remedies prior to bringing this action. (Exhibits A and B).

303.    As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

304.    As a direct and proximate result of the Defendant's willful knowing and intentional discrimination, Plaintiffs have suffered and will continue to suffer pain and suffering, extreme and severe emotional distress, loss of skills, and mental anguish; Plaintiffs have incurred other incidental expenses; Plaintiffs have suffered related to the harm caused by Wal-Mart's violations.

305.    Plaintiffs have and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

306.    Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

307.    In addition, Plaintiffs are entitled to punitive damages for the Defendant's malice and/or reckless disregard of Plaintiffs' federally protected rights.

308.    As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and

continue to incur reasonable attorney's fees and costs. Plaintiffs request that their attorney's fees be awarded pursuant to Title VII.

309.     Plaintiffs, therefore, request relief as provided in the Prayer for Relief below.

## COUNT II—VIOLATION OF TITLE VII
## DISPARATE TREATMENT IN REGION 16
## PLAINTIFFS  CHERYL NOONE, CAROL MILSE, MICHELLE TYRELL, DENISE VAN GALDER, MAVI ALULQUOY,  PAMELA MCCLELEN, RITA WEISZ, SHARON REESE, GINA PORTILLO VIERRA, CHERYL STOUT, AND SHANNON STEPHENSON

310.     Plaintiffs Cheryl Noone, Carol Milse, Michelle Tyrell, Denise Van Galder, Mavi Alulquoy,  Pamela McClelen, Rita Weisz, Sharon Reese, Gina Portillo Vierra, Cheryl Stout, and Shannon Stephenson worked for Wal-Mart in Region 16.

311.     Plaintiffs incorporate and reallege paragraphs 1 through 315 herein.

312.     Wal-Mart denied Plaintiffs pay equal to that earned by similarly situated men on the basis of gender.

313.     Wal-Mart denied Plaintiffs equal opportunities for promotion to positions that the female employees were qualified for and interested in, on the basis of gender.

314.     Wal-Mart's conduct of engaging in discrimination against its female employees working in Region 16 by making compensation and promotion decisions on the basis of gender violates Title VII of the Civil Rights Act of 1964.

315.     Wal-Mart's discriminatory practices described above have denied Plaintiffs and other female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

316.   The Defendant has failed to comply with their statutory duty to take all reasonable and necessary steps to eliminate discrimination from the work place and to prevent it from occurring.

317.   Wal-Mart's alleged reasons, if any, for their discrimination against Plaintiffs on the basis of their gender is a mere pretext, as evidence by the pattern or practice of discrimination against female employees generally.

318.    Plaintiffs have exhausted all of her administrative remedies prior to bringing this action. (Exhibit A and B).

319.   As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

320.   As a direct and proximate result of the Defendant's willful knowing and intentional discrimination, Plaintifs have suffered and will continue to suffer pain and suffering, extreme and severe emotional distress, loss of skills, and mental anguish; Plaintiffs have incurred incidental expenses; Plaintiffs have suffered related to the harm caused by Wal-Mart's violations.

321.    Plaintiff has and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

322.   Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

323.   In addition, Plaintiffs are entitled to punitive damages for the Defendant's malice and/or  reckless disregard of Plaintiffs federally protected rights.

324.   As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and

continue to incur reasonable attorney's fees and costs. Plaintiffs requests that her attorney's fees be awarded pursuant to Title VII.

325.    Plaintiffs, therefore, requests relief as provided in the Prayer for Relief below.

## COUNT III—VIOLATION OF TITLE VII
## DISPARATE TREATMENT IN REGION 5
## PLAINTIFF CLAUDIA RENATI

326.    Plaintiffs Claudia Renati worked for Wal-Mart at the Sam's Club Region 5.

327.    Plaintiffs incorporate and reallege paragraphs 1 through 315 herein.

328.    Wal-Mart denied Plaintiffs pay equal to that earned by similarly situated men on the basis of gender.

329.    Wal-Mart denied Plaintiffs equal opportunities for promotion to positions that the female employees were qualified for and interested in, on the basis of gender.

330.    Wal-Mart's conduct of engaging in discrimination against its female employees working in Sam's Club Region 5 by making compensation and promotion decisions on the basis of gender violates Title VII of the Civil Rights Act of 1964.

331.    Wal-Mart's discriminatory practices described above have denied Plaintiffs and other female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

332.    The Defendant has failed to comply with their statutory duty to take all reasonable and necessary steps to eliminate discrimination from the work place and to prevent it from occurring.

333.    Wal-Mart's alleged reasons, if any, for their discrimination against Plaintiffs on the basis of their gender is a mere pretext, as evidence by the pattern or practice of discrimination against female employees generally.

334.   Plaintiffs have exhausted all of her administrative remedies prior to bringing this action. (Exhibit A and B).

335.   As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

336.   As a direct and proximate result of the Defendant's willful knowing and intentional discrimination, Plaintifs have suffered and will continue to suffer pain and suffering, extreme and severe emotional distress, loss of skills, and mental anguish; Plaintiffs have incurred incidental expenses; Plaintiffs have suffered related to the harm caused by Wal-Mart's violations.

337.   Plaintiff has and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

338.   Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

339.   In addition, Plaintiffs are entitled to punitive damages for the Defendant's malice and/or reckless disregard of Plaintiffs federally protected rights.

340.   As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and continue to incur reasonable attorney's fees and costs. Plaintiffs requests that her attorney's fees be awarded pursuant to Title VII.

341.   Plaintiffs, therefore, requests relief as provided in the Prayer for Relief below.

**COUNT IV—VIOLATION OF TITLE VII**
**DISPARATE IMPACT IN WAL-MART REGION 19**
**KRISTIN MARSH, HOPE GARCIA, DARLA HARPER, KATHLEEN WILKERSON,**
**JENNIFER SEELY, AND MARY QUINTANILLA**

342.   Plaintiffs worked for Wal-Mart in Region 19.

343.   Plaintiffs incorporate and reallege paragraphs 1 through 293 herein.

344.  Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in Region 19, including the Plaintiffs. Its compensation policies for setting and adjusting pay collectively and individually, including its failure to require or use job related criteria for making compensation decisions, its policy of setting pay adjustments based on the associate's prior pay, and its 2004 pay class restructuring, have had an adverse impact on women. Its promotion policies; its failure to provide for an open application process or job posting; its relocation and travel requirements for management positions; its scheduling requirements that deny managers a consistent schedule; and its failure to apply job-related objective criteria for making management selections, have all, individually and collectively, caused this adverse impact on female employees in promotions, including the Plaintiffs.

345.  In Region 19, Wal-Mart has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually. Nor does Wal-Mart specify the weight that should be accorded to each of its requirements for pay and promotion. Wal-Mart's pay and promotion policies and procedures are, thus, not capable of separation for analysis, and accordingly the entire decision-making process for compensation and promotions decisions may each be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

346.  Wal-Mart's compensation and promotion policies are not job related or consistent with business necessity. Wal-Mart's own consultants and human resources staff have proposed job posting, elimination of relocation requirements, adoption of more consistent and reliable scheduling, and the use of more objective criteria for

management promotions. Adopting these policies would have resulted in less discriminatory impact upon female employees, including the Plaintiffs while serving Wal-Mart's business needs more effectively than its current practices.

347.  Wal-Mart's discriminatory practices described above have denied female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

348.  Plaintiffs have exhausted all of her administrative remedies prior to bringing this action. (Exhibit A and B).

349.  As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

350.  Plaintiff has and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

351.  Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

352.  As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and continue to incur reasonable attorney's fees and costs. Plaintiffs requests that her attorney's fees be awarded pursuant to Title VII.

353.  Plaintiffs, therefore, requests relief as provided in the Prayer for Relief below.

## COUNT V—VIOLATION OF TITLE VII
## DISPARATE IMPACT IN REGION 16

354.  Plaintiffs Cheryl Noone, Carol Milse, Michelle Tyrell, Denise Van Galder, Mavi Alulquoy, Pamela McClelen, Rita Weisz, Gina Portillo Vierra, Cheryl Stout, and Shannon Stephenson incorporate and realleges paragraphs 1 through 293 herein.

355.   Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in Region 16. Its compensation policies for setting and adjusting pay collectively and individually, including its failure to require or use job related criteria for making compensation decisions, has had an adverse impact on women. Its promotion policies; its failure to provide for an open application process or job posting; its relocation and travel requirements for management positions; its scheduling requirements that deny managers a consistent schedule; and its failure to apply job-related objective criteria for making management selections, have all, individually and collectively, caused this adverse impact on female employees in promotions.

356.   In Region 16, Wal-Mart has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually.  Nor does Wal-Mart specify the weight that should be accorded to each of its requirements for pay and promotion. Wal-Mart's pay and promotion policies and procedures are, thus, not capable of separation for analysis, and accordingly the entire decision-making process for compensation and promotions decisions may each be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

357.   Wal-Mart's compensation and promotion policies are not job related or consistent with business necessity. Wal-Mart's own consultants and human resources staff have proposed job posting, elimination of relocation requirements, adoption of more consistent and reliable scheduling, and the use of more objective criteria for management promotions. Adopting these policies would have resulted in less

discriminatory impact upon female employees while serving Wal-Mart's business needs more effectively than its current practices.

358.    Plaintiffs have exhausted all of her administrative remedies prior to bringing this action. (Exhibit A and B).

359.    Wal-Mart's discriminatory practices described above have denied female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

360.    .

361.    As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

362.    Plaintiff has and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

363.    Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

364.    As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and continue to incur reasonable attorney's fees and costs. Plaintiffs requests that her attorney's fees be awarded pursuant to Title VII.

365.    Plaintiffs, therefore, requests relief as provided in the Prayer for Relief below.

<b>COUNT VI—VIOLATION OF TITLE VII<br>DISPARATE IMPACT IN REGION 5</b>

366.    Plaintiff Claudia Renati incorporates and realleges paragraphs 1 through 293 herein.

367.    Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in Sam's Club Region 5. Its compensation policies for setting and adjusting pay collectively and

individually, including its failure to require or use job related criteria for making compensation decisions, has had an adverse impact on women. Its promotion policies; its failure to provide for an open application process or job posting; its relocation and travel requirements for management positions; its scheduling requirements that deny managers a consistent schedule; and its failure to apply job-related objective criteria for making management selections, have all, individually and collectively, caused this adverse impact on female employees in promotions, including Plaintiff Forbes.

368.   In Region 5, Wal-Mart has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually.  Nor does Wal-Mart specify the weight that should be accorded to each of its requirements for pay and promotion. Wal-Mart's pay and promotion policies and procedures are, thus, not capable of separation for analysis, and accordingly the entire decision-making process for compensation and promotions decisions may each be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

369.   Wal-Mart's compensation and promotion policies are not job related or consistent with business necessity. Wal-Mart's own consultants and human resources staff have proposed job posting, elimination of relocation requirements, adoption of more consistent and reliable scheduling, and the use of more objective criteria for management promotions. Adopting these policies would have resulted in less discriminatory impact upon female employees while serving Wal-Mart's business needs more effectively than its current practices.

370.   Wal-Mart's discriminatory practices described above have denied female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

371.   Plaintiffs have exhausted all of her administrative remedies prior to bringing this action. (Exhibit A and B).

372.   As a result of Wal-Mart's violations, the Plaintiffs have suffered damages.

373.   Plaintiff has and will continue to suffer a loss of earnings and other employment-related benefits and job opportunities.

374.   Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

375.   As a further direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and continue to incur reasonable attorney's fees and costs. Plaintiffs requests that her attorney's fees be awarded pursuant to Title VII.

376.   Plaintiffs, therefore, requests relief as provided in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.   A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. § 2000(e), et. seq., Title VII of the Civil Rights Act of 1964;

b.   General and compensatory damages;

c.   Reinstatement or front pay;

d.   Back pay;

e.  Punitive damages;

f.  Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

g.  Pre-Judgment and Post-Judgment interest, as provided by law; and

h.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues, claims, actions, and defenses in this case.

Dated this 14th day of November  2019.


Respectfully submitted,

s/ Lindsey Wagner
Lindsey Wagner, Esq.
California Bar No. 309808
Cathleen Scott, Esq.
Florida Bar No.: 135331
Cscott@scottwagnerlaw.com
Lindsey Wagner, Esq.
lwagner@scottwagnerlaw.com
**Scott Wagner and Associates, P.A.**
**Main Office:**
   Jupiter Gardens
   250 South Central Boulevard, Suite 104
   Jupiter, FL 33458
   Telephone: (561) 653-0008
   Facsimile: (561) 653-0020
**California Office:**
   3900 W. Alameda Avenue, Suite 1200
   Burbank, CA 91505
   Telephone: (213)377-5200
   Facsimile: (561) 653-0020

## SERVICE LIST
### Case No.  19-cv-02525-CRB

Scott A. Forman, Esq.
Littler Mendelson, P.C.
333 SE 2nd Avenue, Suite 2700
Miami, FL 33131
305.400.7511
sforman@littler.com

Jeffrey Mann, Esq.
Littler Mendelson, P.C.
1255 Treat Blvd., Suite 600
Walnut Creek, CA 94597
925.932.2468
jmann@littler.com

BARBARA A. BLACKBURN, Bar No. 253731
bblackburn@littler.com
LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, California 95814
Telephone: 916.830.7200
Facsimile: 916.561.0828